IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF ILLINOIS, <br><br> Plaintiff, <br><br> v. <br><br> PAT QUINN, in his official capacity as Governor of the State of Illinois, and WILLIAM M. McGUFFAGE, JUDITH C. RICE, BRYAN A. SCHNEIDER, CHARLES W. SCHOLZ, JESSE R. SMART, HAROLD D. BYERS, ERNEST C. GOWEN and BETTY J. COFFRIN in their Official capacities as members of the Illinois State Board of Elections, <br><br> Defendants. | Case. No. 11-cv-5569 <br><br> Hon. Elaine E. Bucklo <br> Hon. Diane S. Sykes <br> Hon. Phillip P. Simon <br><br> (3-judge court convened pursuant to 28 U.S.C. § 2284) |

## DEFENDANTS' REPLY IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS AMENDED COMPLAINT

Defendants, through their attorneys and for their Reply in further support of their Motion to Dismiss the Amended Complaint, state as follows:

### Introduction

In its Response to the Motion to Dismiss ("Pl. Resp."), Plaintiff lays out its theory of the case as essentially one of unconstitutional government suppression of political speech. In doing so, Plaintiff relies almost exclusively on Supreme Court campaign-finance cases—*i.e.*, cases involving the regulation of campaign contributions and expenditures, which have long been recognized as protected speech—none of which has anything at all to do with the redistricting process. Those cases held that the government could not regulate or suppress the *amount* of direct speech in which a voter or candidate could engage. Limitations on the amount of campaign expenditures are a direct and obvious limitation on the amount of speech permitted by

law. Here, in contrast, Plaintiff does not (and cannot) allege that Public Act 97-6 limits anyone from engaging in any kind of speech whatsoever—through a campaign contribution, a newspaper advertisement, an e-mail, or by shouting in the town square. A redistricting map does not and cannot limit the *amount* of speech in which a citizen may engage.

In the introduction to its Response, Plaintiff implies that partisan composition was the only factor considered by the General Assembly, citing House Resolution 385 and Senate Resolution 249. (Pl. Resp. at 1.) In reality, those Resolutions state that partisan composition was only one of several factors considered, including population equality, compactness, contiguity, and many other legal considerations. *See* H. Res. 385, 97th Ill. Gen. Assembly at 2; S. Res. 249, 97th Ill. Gen. Assembly at 2-3.[1] To Plaintiff, however, this is immaterial. The fact that partisan composition was *a* factor—whether the only factor, or one of ten or one of a thousand—renders the entire Redistricting Plan invalid. If Plaintiff's reasoning were adopted, it would run directly contrary to a sea of case law from the Supreme Court approving the use of partisan considerations in drawing House and Senate boundaries. In fact, courts have even dismissed political gerrymander claims where the *sole* motivation of the drafters was political gain. While Plaintiff assures the Court that it is not relying on those cases for its novel legal theory, the fact remains that those cases simply could not stand in the face of Plaintiff's cause of action.

## Argument

I. **Plaintiff's Reliance on Campaign-Finance Cases is Inapposite Because a Redistricting Map Does Not, and Cannot, Limit the Total Amount of Political Speech.**

For its admittedly unprecedented theory of governmental suppression of political speech, Plaintiff principally relies on *Citizens United v. Federal Election Comm'n*, 558 U.S. _, 130 S. Ct.

---

[1] *See* http://www.ilga.gov/legislation/97/HR/09700HR0385lv.htm and
http://www.ilga.gov/legislation/fulltext.asp?DocName=&SessionId=84&GA=97&DocTypeId=SR&DocNum=249&GAID=11&LegID=61790&SpecSess=&Session=.

2

876 (2010), *Arizona Free Enterprise Club v. Bennett,* _U.S. _, 131 S. Ct. 2806 (2010), and *Davis v. Federal Election Comm'n,* 554 U.S. 724 (2008). In each of those decisions, the Supreme Court adopted the perfectly reasonable and consistent position that a statute limiting the total amount of political speech is an unconstitutional violation of the First Amendment. Here, Plaintiff does not allege that the redistricting plan limits the *amount* of political speech permitted in Illinois. Instead, Plaintiff alleges that the inclusion of partisan political data in the redistricting process limits the *effectiveness* of certain people's political speech depending on the legislative district in which they reside. Because neither this, nor any other, redistricting map could possibly impact the total amount of anyone's political speech—either directly or indirectly—this reliance is misplaced.

In *Citizens United*, the Supreme Court took up the constitutionality of a federal law prohibiting corporations and unions from using their general treasury funds to make independent expenditures for certain forms of political speech. *Citizens United,* 130 S. Ct. at 886. The Court first noted that "[t]he law before us is an outright ban, backed by criminal sanctions." *Id.* at 897. The Court found the law unconstitutional because, by banning certain political speech, the law "necessarily reduce[d] the *quantity* of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Id.* at 898 (emphasis added) (quoting *Buckley v. Valeo,* 424 U.S. 1, 19 (1976) (*per curiam*)).

Similarly, in *Davis v. FEC*, the Supreme Court invalidated the so-called "Millionaire's Amendment" to the federal campaign finance laws whereby the contribution limits applicable to some candidates were removed if their opponents spent more than $350,000 of their own money in an election campaign; the wealthy opponent, however, did not also receive that increased contribution limit. 554 U.S. at 729. In *Davis*, the plaintiff was a self-financing candidate who

3

claimed that the prospect of increased contribution limits for his opponent (without a corresponding increase for him) chilled his First Amendment right to spend an unlimited amount of his own funds for his campaign. *Id.* at 736. The Supreme Court agreed that the statute "imposes an unprecedented penalty on any candidate who robustly exercises" his or her First Amendment rights because it "requires a candidate to choose between the First Amendment right to engage in unfettered political speech and subjection to discriminatory fundraising limitations." *Id.* at 739. The "candidate who wishes to exercise that right has two choices: abide by a limit on personal expenditures or endure the burden that is placed on that right by the activation of a scheme of discriminatory contribution limits." *Id.* at 740. Thus, because the statute had the consequence of restricting the amount of a candidate's speech, the Court held that the statute violated the First Amendment. *Id.* at 742-44.

Most recently, in *Arizona Free Enterprise*, the Supreme Court struck down Arizona's public financing system that increased public funding for certain candidates as their opponents spent more privately-raised funds in an election campaign. 131 S. Ct. at 2813. In other words, the more a candidate spent on behalf of his or her campaign, the more the government contributed to his or her opponents. Not surprisingly, the Supreme Court held that this "scheme substantially burdens protected political speech" and invalidated the statute. *Id.* The Court noted that the Arizona law was "*more* constitutionally problematic, not less" than the statute invalidated in *Davis* because in *Davis*, the "candidate who benefited from the increased limits still had to go out and raise the funds" whereas in Arizona "the benefit to the publicly financed candidate [was] the direct and automatic release of public money. That is a far heavier burden than in *Davis*." *Id.* at 2818-19. The Supreme Court invalidated the public financing statute for exactly the same reason that it invalidated the statutes in *Citizens United* and *Davis*: '[t]he

130159286v1 0747293 39607

burden imposed on privately financed candidates and independent expenditure groups *reduces* their speech...." *Id.* at 2820-21(emphasis added).

Each of these decisions is consistent with the Court's conclusion in *Buckley* that laws restricting the *amount* of political speech are unconstitutional: "Being free to engage in unlimited political expression subject to a ceiling on expenditures is like being free to drive an automobile as far and as often as one desires on a single tank of gasoline." *Buckley*, 424 U.S. at 19 n.18.

But none of those cases offer any support to Plaintiff's unprecedented cause of action. Plaintiff does *not* allege that the Redistricting Plan limits the amount of political speech that any person or organization may engage in. Plaintiff does not even allege that any particular *type* of speech is limited. Clearly, every Illinois citizen, whether a member of the Plaintiff association or not, is free to engage in as much political speech as he or she chooses, without suffering any adverse consequences. There is certainly no flat prohibition on political speech of any kind or amount (as in *Citizens United*). A person making political speech need not worry that the State will empower (as in *Davis*) or subsidize (as in *Arizona Free Enterprise*) their opponents' speech. Everyone is free to air as many advertisements, post as many billboards, send as many mailers and make as many speeches as they wish without any interference or consequence from the government. Simply put, there is absolutely no restriction on the type or amount of speech in which an Illinois citizen may engage under P.A. 97-6.

None of the cases Plaintiff cites, nor any others of which Defendants are aware, afford certain citizens the right to *prevail* in political debate. *See Initiative and Referendum Institute v. Walker*, 450 F.3d 1082, 1101 (10th Cir. 2006) ("[t]he First Amendment ensures that all points of view may be heard; it does not ensure that all points of view are equally likely to prevail."). Instead, the First Amendment affords the opportunity to participate in that debate fully and

5

freely. Plaintiff does not allege that their ability to speak is in any way fettered by the Redistricting Plan.

Plaintiff claims that the State's pursuit of "competitive" and "fair" elections is the equivalent of a campaign-finance law aimed at "leveling the playing field." (Pl. Resp. at p. 5.) But its analogy to *Arizona Free Enterprise*—claiming that the "state law sought only to ENHANCE speech" (*id*. at 7 (emphasis in original))—is completely inaccurate. As discussed above, that state law *limited* the speech of the privately-financed candidates. *Arizona Free Enterprise*, 131 S. Ct. at 2820-22. The Supreme Court rejected the "leveling-the-playing-field" defense of the statute, but not because it leveled the playing field—rather, the constitutional flaw was that it attempted to do so by limiting the amount of speech on one side of the debate. *Id*. This decision is entirely consistent with *Buckley*, *Davis*, and *Citizens United*.

Moreover, as much as Plaintiff repeatedly decries the State's attempts to make "competitive" districts that will result in "fair" elections (*see* Pl. Resp. at 1, 5, 6, 8, 11), it is in these very districts that the public debate and political speech will be most vigorous and productive. Do Plaintiff's members really prefer to be randomly drawn into a district where their views are either in a significant minority or in an overwhelming majority in a particular district? This result, it should be noted, is actually the most likely outcome of a partisanship-blind districting process—particularly where, as in Illinois, the majority of voters have tended to support one political party over another for a period of time.[2] Thus, the result Plaintiff seeks—a partisanship-blind redistricting process—will likely result in fewer competitive elections, not more. As a result, Plaintiff's members will have less opportunity to influence the election process, not more. The State, on the other hand, views competitive and fair districts as an

---

[2] According to the Illinois State Board of Elections, since the last redistricting in 2001, the Democratic candidate has prevailed in 17 of 21 statewide general elections (17 of 22 if the special Senate election conducted at the same time as the 2010 General Election is included). *See* http://www.elections.il.gov/ElectionInformation/GetVoteTotals.aspx.

attribute rather than an evil.

Plaintiff's theory is more akin to a public-policy discussion than a constitutional challenge. Under Plaintiff's theory, if a Democrat, for example, were drawn into a Republican district, her speech would be "chilled" if that district were drawn as a product of a map that considered partisan data; but if she wound up in that same district, with the precise same political composition, "randomly" as a result of a map that considered only "neutral" factors, that person would not suffer any such injury. Stripped to its essence, then, Plaintiff's theory is not really about protecting the First Amendment rights of voters at all. It does not focus on "harm" to the voter in any way. It is about Plaintiff's view of how a redistricting process should operate—that Illinois "use a process based on neutral criteria." (Pl. Resp. at 8.) There is certainly nothing wrong with Plaintiff holding such an opinion, but a public-policy objection is not a constitutional claim.

Finally, the very premise of the Amended Complaint is belied by recent history. In short, Plaintiff claims that use of partisanship data in the redistricting process means that some voices will not be heard in some districts—*i.e.*, a Democratic voice will not be heard in a Republican-majority district or vice-versa. As indicated in our previous Memorandum of Law, one need only look to the results of the 2010 elections to see the foolishness of this "why-bother" attitude. The 2001 Congressional Redistricting Plan, drawn considering political data and other factors, saw four congressional seats (the 8th, 11th, 14th, and 17th) change from Democrat to Republican in the 2010 election alone, while the 2001 State Map, also drawn using partisan considerations, saw six House seats change from Democratic to Republican in that election. Does that mean that these same redistricting maps were political gerrymanders against Republicans in 2008, but *for* them in 2010? In reality, the current redistricting process produced an electoral scheme whereby

130159286v1 0747293 39607

all sides were free to engage in complete, unfettered debate that resulted, not surprisingly, in mixed results for both sides. That is not unconstitutional suppression of political speech. It is democracy.[3]

## II. The Amended Complaint Should be Dismissed Because Political Considerations are an Appropriate Consideration in the Redistricting Process.

### A. The Supreme Court Recognizes Partisanship Considerations as a Necessary and Legitimate Redistricting Tool.

Plaintiff's theory of the case, that the use of *any* partisanship data in the redistricting process would render the product of that process unconstitutional, was expressly rejected by the Supreme Court almost 40 years ago: "It would be idle, we think, to contend that any political consideration taken into account in fashioning a reapportionment plan is sufficient to invalidate it." *Gaffney v. Cummings,* 412 U.S. 735, 752-753 (1973). Since then the Supreme Court has repeatedly, and without exception, endorsed the use of partisanship data in the redistricting process. *Vieth v. Jubelirer,* 541 U.S. 267, 286 (2004) (plurality opinion) ("partisan districting is a lawful and common practice..."); *Shaw v. Reno,* 509 U.S. 630, 646 (1993)('the legislature ... when it draws district lines, is aware of ... political persuasion, and a variety of other demographic factors.:); *Davis v. Bandemer,* 478 U.S. 109, 126-127 (1986) (plurality opinion) ('The reality is that districting inevitably has and is intended to have substantial political consequences.") (quoting *Gaffney,* 412 U.S. at 752-53).

In its most recent decision regarding political districting, the Supreme Court again rejected a political gerrymander claim. *League of United Latin American Citizens v. Perry* 548 U.S. 399 (2006) (*"LULAC"*). That decision, more than any other, highlights the lack of merit in Plaintiff's argument. In *LULAC,* the appellants argued that a mid-decennial redistricting plan

---

[3] Apparently Plaintiff no longer objects to the use of partisanship data in drawing Congressional districts. Its original Complaint challenged such districts, but it after dropping its challenge to the Congressional Districts in this case, it has not refiled any action against the Congressional Districting Plan.

8

violated the Equal Protection Clause and the First Amendment because it was solely motivated by partisan objectives. *Id.* at 416-17 (Kennedy, J.). However, a majority, although for separate reasons, rejected the "sole motivation" standard. *Id.* at 417-19 (Kennedy, J.) (finding the standard unconvincing); *id* at 492 (Roberts, C.J., joined by Alito, J., concurring in part, concurring in judgment in part, and dissenting in part) (agreeing that appellants had not provided a reliable standard); *id.* at 511-12 (Scalia, J., joined by Thomas, J., concurring in judgment in part and dissenting in part) (concluding that political gerrymandering claims are nonjusticiable and stating that Justice Kennedy's discussion of appellant's political gerrymandering claims shows that no one has put forth a judicially discernible standard).

In short, the *LULAC* majority rejected the suggestion that a map would be invalid when partisanship was the *sole* consideration driving a redistricting plan, yet Plaintiff now suggests that the Court would approve of a theory that invalidates a map if partisanship is even a *minor* consideration. The two positions are irreconcilable. It would be impossible for Plaintiff's cause of action to be recognized by this Court without directly conflicting with the Supreme Court cases cited above.

**B.  Plaintiff's First Amendment Political Gerrymander Claim Should be Dismissed Because it Fails to Allege a Manageable Standard.**

Plaintiff claims that it is bringing a First Amendment "political gerrymandering" claim. (Pl. Resp. at 9.) It is not the first plaintiff to do so; it is unlikely to be the last. Indeed, the Plaintiffs in the related case of *Radogno v. Illinois State Bd. of Elections*, 1:11-cv-04884, have also brought a First Amendment political gerrymandering claim challenging the same redistricting plan—though admittedly not one predicated on a campaign-finance theory. This Plaintiff's claim must fail, among other reasons, for the same reason that the claim brought by the *Radogno* Plaintiffs must fail and for the same reason that every other political

9

gerrymandering claim, First Amendment or otherwise, challenging a redistricting plan in any court in the nation has failed: it does not allege a manageable standard by which the claim can be judged.

As Justice Scalia's plurality opinion in *Vieth* makes clear, political gerrymander claims have all failed because "no judicially discernable and manageable standards for adjudicating political gerrymandering claims have emerged." *Vieth*, 541 U.S. at 281. Plaintiff, just like the *Radogno* Plaintiffs did, latch onto Justice Kennedy's concurring opinion in *Vieth*, but that is no help to them. First, Justice Kennedy specifically agreed with the plurality that the *Vieth* political gerrymander claims "must be dismissed." *Id*, 541 U.S. at 306 (Kennedy, J. concurring). Second, and more importantly, Justice Kennedy further agreed with the plurality that the *Vieth* plaintiffs failed to allege an adequate standard to measure their political gerrymander claim. *Id.* at 311 ("no such standard has emerged in this case..."). However, Justice Kennedy did not go as far as the plurality because that failure "should not be taken to prove that none will emerge in the future" and that "in another case a standard might emerge..." *Id.* at 311, 312.

This, however, is not that case. At best, *Vieth* provides a plaintiff an opportunity to do what no other plaintiff has ever done: plead and prove an adequate standard for measuring political gerrymandering claims. In *Vieth*, the Supreme Court rejected a "totality of the circumstances" test for political gerrymander claims. *Vieth*, 541 U.S. at 291. The Court also rejected a "predominant intent" standard (*id.* at 284), and the two-pronged (intent and effect) standard set forth in *Davis v. Bandemer*, 478 U.S. 109 (1986), measuring plaintiffs' "direct or indirect influence on the elections of the state legislature as whole." *Id.* at 282. The plurality rejected Justice Stevens' proposed use of racial gerrymandering analysis (*id.* at 293-294), Justice Souter's proposed Title VII based standard (*id.* at 295), and Justice Bryer's proposed "unjustified

10

entrenchment" standard. *Id.* at 299. The Court has also subsequently rejected both a "sole intent" test and a proposed "symmetry standard." *LULAC*, 548 U.S. at 418-420.

To the extent Plaintiff can be said to offer a standard, it could probably best be described as a "zero tolerance" standard. Plaintiff suggests that the use of partisanship data—any use of it—renders a map invalid. A redistricting plan where partisanship was weighted 1% or $1/100^{th}$ of 1% is just as invalid as one where it was weighted 10% or 100%. Interestingly, the results of a redistricting plan would be irrelevant; only the process matters. The best, fairest, most ideal legislative map ever drawn would be entirely invalid if anyone involved in the process ever gave passing consideration to the plan's partisan ramifications.

In considering standards against which to measure political gerrymander claims, the Supreme Court has rejected, amongst many others, both a "predominant intent" standard, *Vieth*, 541 U.S. at 284, and a "sole intent" standard. " *LULAC*, 548 U.S. at 418-420. Plaintiff's contention that the Supreme Court would nonetheless adopt its proposed "any small part of intent" standard, and thereby invalidate virtually every redistricting plan ever drawn by any legislative body, is simply fanciful. The Amended Complaint should be dismissed.[4]

WHEREFORE, for the foregoing reasons, Defendants respectfully pray that this Court grant its Motion to Dismiss the Amended Complaint.

                                              Respectfully submitted,

                                              By: /s/ Richard J. Prendergast

                                              One of the Attorneys for Defendants William M. McGuffage, Judith C. Rice, Ryan A. Smart, Harrold D. Byers, Ernest C. Gowen and Betty J. Coffrin

---

[4] Plaintiff agrees that Governor Quinn should be dismissed as an improper party. (Pl. Resp. at 3.)

| | | |
|---|---|---|
| Brent D. Stratton<br>Chief Deputy Attorney General<br>Office of the Illinois Attorney General<br>100 W. Randolph, 12th Floor<br>Chicago, IL 60601<br>(312) 814-4499 | | Richard J. Prendergast<br>Michael T. Layden<br>Special Asst. Attorneys General<br>Richard J. Prendergast, Ltd.<br>111 W. Washington St., Suite 1100<br>Chicago, Illinois 60602<br>(312) 641-0881 |
| David W. Ellis<br>Special Asst. Attorney General<br>402 State House<br>Springfield, IL 62706<br>(217) 782-3392 | Eric M. Madiar<br>Special Asst. Attorney General<br>605 State House<br>Springfield, IL 62706<br>(217) 782-2156 | Michael J. Kasper<br>Special Asst. Attorney General<br>222 N. LaSalle St., Suite 300<br>Chicago, IL 60601-1013<br>(312) 405-3292 |

Respectfully submitted,

By: /s/ Brent D. Stratton

One of the Attorneys for Defendant Pat Quinn

Brent D. Stratton
Chief Deputy Attorney General
Office of the Illinois Attorney General
100 W. Randolph, 12th Floor
Chicago, IL 60601
(312) 814-4499

130159286v1 0747293 39607